1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD SCHULTZ, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SKILLZ INC., f/k/a FLYING EAGLE ACQUISITION CORP., ANDREW PARADISE, CASEY CHAFKIN, and MIRIAM AGUIRRE, SCOTT HENRY, and HARRY SLOAN,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard Shultz ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned counsel, hereby brings this Class Action Complaint for Violation of Federal Securities Law ("Complaint") against Skillz Inc. f/k/a Flying Eagle Acquisition Corp. ("FEAC") (collectively, the "Skillz" or the "Company"); Andrew Paradise ("Paradise"), Skillz Chief Executive Officer ("CEO"); Scott Henry ("Henry"), Skillz Chief Financial Officer ("CFO"); Casey Chafkin ("Chafkin"), Skillz Chief Revenue Officer ("CRO"); Miriam Aguirre ("Aguirre"), Skillz Chief Technology Officer ("CTO"), and Harry Sloan ("Sloan"), President of FEAC based upon, *inter alia*, the investigation conducted by and under the supervision of Plaintiff's counsel, which included a review of the Company's public documents, conference calls, and announcements, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, analysts' reports and advisories about the Company and readily obtainable information. Plaintiff's counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Company, Defendant Paradise, Defendant Chafkin, Defendant Aguirre and Defendant Henry. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of those who purchased or otherwise acquired Skillz securities between December 16, 2020 and April 19, 2021, inclusive (the "Class Period"). Plaintiff seeks to pursue remedies against Skillz and certain of the Company's current senior executives under the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.  Skillz is an internet tech company that was founded in 2012 and is headquartered in San Francisco, California. Skillz provides a proprietary gaming platform for mobile gaming users and

1

developers. It connects players worldwide by hosting fee-based competitive eSports games on its platform. Skillz also provides an integrated "developer console" for its game developer customers that enables them to create, rapidly integrate and monitor the performance of their games on Skillz's platform. According to Skillz, its gaming platform "allows us to deliver gaming experiences that our player community trusts and loves and 'levels the playing field' for every developer. We believe we are re-inventing competitive mobile gaming and thereby expanding the mobile gaming market. Our technology platform aligns the interests of developers and gamers with respect to user monetization, instead of putting them at odds." Skillz revenue is derived exclusively by taking a percentage of player entrance fees in paid contests. In 2013, Skillz was kicked off of the Google Play Store. Android users must know how to use the Android Store or manually install the games.

3. Throughout the Class Period, Defendants disseminated false and misleading statements and omissions that materially misrepresented Skillz's purported financial condition and prospects. These materially misleading statements and omissions included representations relating to certain of Skillz's business operations, performance metrics and ultimate valuation, including, among others, Skillz's ability to attract new end-users, future profitability, the shrinking popularity of its hosted games that accounted for 88% of its revenue, and the Company's valuation. For example, one of the Company's objectively unrealistic promises included the unsupportable claim that the Company was valued at $3.5 billon, based on revenue projections in excess of $550 million for 2022. However, the Company failed to inform investors that downloads of the games that account for a majority share of its revenue have been declining since at least November 2020. In reality, the Company's prospects for attaining that revenue scale was far from realistic given its size, market share, reliance on third-party app stores, declining downloads of its most popular games and, critically, the enormous amount of incentive Bonus Payments that Skillz routinely provides to its gamer customers, a fact that investors were misled about. These Bonus Payments are routinely provided to its customers, who are expected to

use them for game entry fees, which, in turn, artificially inflates Skillz revenue.

4.      Skillz offers Bonus Cash in order to incentivize users and gamers to engage with their platform.  However, Skillz's disclosure is materially incomplete since it fails to disclose that Bonus Cash boomerangs back into the revenue stream.  Essentially, Skillz has the ability to offer millions of dollars in Bonus Cash and simultaneously report millions of dollars in revenue.  Had this buried information been candidly disclosed, investors would have had a more somber picture of the Company's growth potential.

5.      Skillz's bullish market pronouncement misled investors into believing that the Company was well-positioned for rapid long-term growth.  As one research analyst later described the result of Skillz's strategy, "[i]ts just a pretty little piece of ice in the water until you hit it and found out it's an iceberg."

6.      That iceberg hit investors just four months after Skillz was taken public.  On March 8, 2021, Wolfpack Research released a report titled, "SKLZ: It Takes Little Skill to see this SPACtacular Disaster Coming" (the "Wolfpack Report").  The Wolfpack Report alleges that the growth speculations that Skillz and its insiders had touted were "entirely unrealistic."  The Wolfpack Report alleges that Skillz's top three games, representing 88% of Skillz's revenue reported a decline in downloads since the third quarter of 2020.  It states that three games Skillz relies on for 88% of its revenue, produced by two developers, Tether Studios and Big Run Studios, had begun to decline prior to Skillz going public.  Downloads of these games all declined by 52% (21 Blitz), 40% (Soliatare Cube), and 20% (Blackout Bingo) in the fourth quarter of 2020.  The Wolfpack Report concluded that Skillz buried this decline in downloads and revenue in its disclosures while continuing to tout massive future revenue growth.

7.      The Wolfpack Report also reveals that Skillz is not taken seriously by industry experts because Skillz's platform is not robust enough to handle synchronous play and international matchmaking.  Skillz is also banned from the Google Play Store, a major conduit for game developers.

3

The Wolfpack Report also shows that Skillz has a history of boasting about future partnerships that either do not have tremendous value, or never amount to anything.  Lastly, the Wolfpack Report alleges that CEO Paradise is not as experienced as Skillz purports to claim and in fact has been involved several failed businesses.

8.     Upon release of the Wolfpack Report, Skillz stock plummeted 10.9% to close at $24.45, down $3 from the previous day.  This decline represented close to a $762 million loss in market value.

9.     Soon thereafter, on March 15, 2021, a Twitter user known as "@Restrinct" published a report highlighting issues with Skillz's unsustainable business model, unrealistic growth projections and tremendous sales and marketing spending.

10.    Finally, on April 19, 2021, Eagle Eye Research posted an anonymous report on Twitter in which it claimed that, through the use of providing users with incentive Bonus Payments, "the company likely recognizes substantial non-cash revenue, and [] cash revenues may be less than ½ of GAAP revenue".  On this news, SKLZ shares declined 6.61% to close at $14.11 (a decline of $1 from the previous day) on April 19, 2021 and shares further declined the next day to an all-time low of $12.55.  The decline represented $254 million in loss of investor value.

11.    The new information to the market about Skillz's failed business prospects and over-hyped valuation was confirmed on May 5, 2020, when Skillz issued its first quarter earnings statement which reflected a $53 million loss, despite the fact that its earnings had increased, as compared to the same time in 2020.

## JURISDICTION AND VENUE

12.    The claims asserted herein arise under Section 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14.     This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with the judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.  The Company is also headquartered in this district.

15.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions were made or omitted, and the subsequent damages took place in this Judicial District and the Company is based in this district.

16.     In connection with the acts alleged in this Complaint, Skillz, directly or indirectly, used the instrumentalities of interstate commerce, including interstate wires, U.S. Postal Service mail, wireless spectrum, and the national securities exchange.

17.     <u>Intradistrict Assignment</u>: Skillz maintains a corporate office in the County of San Francisco.  As such, this action may be properly assigned to the San Francisco/Oakland division of this Court pursuant to Civil Local Rule 3-2(d).

**PARTIES**

18.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

19.     Defendant Skillz Inc. ("Skillz"), f/k/a Flying Eagle Acquisition Corp. ("FEAC"), operates an online mobile multiplayer competition proprietary platform.  Players use it to compete in online competitions against other players across the world.  Defendant Skillz is incorporated in Delaware and maintains its principal executive offices at P.O. Box 445, San Francisco, CA 94104.

20.     Defendant Paradise is a co-founder of Skillz and currently serves as the Company's Chief Executive Officer.

21.     Defendant Henry has served as the Company's Chief Financial Officer since August 2020.

22.     Defendant Chafkin is a co-founder of Skillz and currently serves as the Company's Chief Revenue Officer.

23.     Defendant Aguirre has served as the Company's Chief Technology Officer since November 2013.

24.     Defendant Sloan is currently a member of the Board of Directors of Skillz.  Sloan was also the President and Chairman of FEAC.

25.     Defendants Paradise, Henry, Chafkin, Aguirre, and Sloan are collectively referred to herein as "Individual Defendants."

26.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

27.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

28.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.     Blank Check Companies and SPACs

29.     FEAC was formed in early 2020 as a "blank check" company.  A "blank check" company is a company that has no specific established business plan or purpose or has indicated that its business plan is to engage in a merger or acquisition with an unidentified company, entity or person.

30.     One type of "blank check" company is a "special purpose acquisition company," or "SPAC."  A SPAC is a publicly-traded company created specifically to pool funds through an initial

public offering for the purpose of completing an acquisition or other business combination with an existing company.  Generally, SPACs are founded by public companies or private asset managers. Since 2014, there has been a resurgent interest in SPAC initial public offerings, and over $10 billion in total funds were raised towards SPACs in 2017.

31.    In order to create a SPAC, founders must invest the initial capital to recruit an investment bank to structure capital raising terms, prepare and file initial public offering documentation, and pre-market the investment offering to interested investors.  A target company cannot be identified before the SPAC initial public offering is completed.  Once capital is raised through the initial public offering, at least 90% of the proceeds must be deposited into a trust account, and any interest is paid to the investors.  An appointed management team (typically the SPAC's founders) then has a specified time period, typically between 18 and 24 months, in which to identify an appropriate target to complete the merger or acquisition.  NASDAQ rules dictate the initial business combination must be with one or more target businesses that together have a fair market value equal to 80% of the balance in the SPAC trust account.  Although the only purpose of a SPAC is to acquire a target company, SPACs generally have corporate governance structures similar to that of other operating companies.

32.    Typically, common stockholders of the SPAC are granted voting rights to approve or reject the business combination proposed by the management team.  Thus, when the management team identifies a target, a merger proxy statement must be filed on Form S-4 with the SEC and distributed to all SPAC stockholders.  The Form S-4 will include the target company's complete audited financials and the terms of the proposed business combination.  Stockholders in SPACs depend on management to honestly provide accurate information about any contemplated transactions in accordance with the requirements under the federal securities laws.  In anticipation of the shareholder vote, each SPAC shareholder has three options, they can: (i) approve the transaction by voting in favor of it; (ii) elect to

sell their shares in the open market; or (iii) vote against the transaction and redeem their shares for a pro-rata share of the trust account.

33.     If a merger or acquisition is successfully made within the allocated time frame, shareholders and management of the SPAC can profit through their ownership of the common stock and any related securities (it is common for SPAC initial public offerings to include "units" consisting of both stock and out-of-the-money warrants).  However, if an acquisition is not completed within the time period specified at the time when the SPAC is organized, then the SPAC is automatically dissolved, and the money held in trust is returned back to investors.  No salaries, finder's fees or other cash compensation are paid to the founders and/or management team if they fail to consummate a successful business combination.  Accordingly, the founders and management team of a SPAC, who typically own approximately 20% of the company, through founders' shares, and invest significant resources in the formation of the company and identifying acquisition targets, are highly incentivized to get a qualifying transaction approved within the operating deadline.

34.     Indeed, leaders in the finance industry have opined that SPAC management teams face an inherent conflict of interest with public stockholders in that management has an incentive to spend the money they have raised, no matter what, so they can collect fees and pay themselves in salary and stock options from the company they purchase.  For example, Ben Dell, managing partner of investment firm Kimmeridge Energy, recently stated that "SPACs are the most egregious example in the industry of executive misalignment with investors."

35.     As set forth herein, Skillz exemplified the problem with SPACs.  Defendants were incentivized to, and did, consummate the Business Combination that was not in the best interests of public investors, to whom they made material misstatements and omissions about Skillz while actively implementing practices to grossly overvalue the Company.

36.     FEAC was formed as a SPAC in early January 2020 by its sponsor Eagle Equity Partners

II, LLC, led and controlled by Defendant Sloan.  Within eight months, Defendants FEAC and Sloan had secured $158 million in private placement commitments in connection with a business combination between FEAC and its target – Skillz.  After a definitive merger agreement and subscription agreements were executed, on September 8, 2020, FEAC, through its Board of Directors, filed a merger proxy statement and prospectus with the SEC on Registration Form S-4 ("Merger Proxy Statement").

37.     After a series of amendments to the Merger Proxy Statement were filed with the SEC over the course of the next several months (the last of which was November 30, 2020), and FEAC filed is final prospectus on December 1, 2020, FEAC and Skillz consummated their merger on December 16, 2020.

38.     This merger transaction valued Skillz at $3.5 billion.  As described below, this valuation was grossly overstated because it relied on revenue projections that had little basis in reality since, according to Skillz own financial statements, a substantial portion of Skillz reported revenue is generated through Skillz's own cash, which it provides to its gamer customers in the form of Bonus Cash incentives.  Skillz's gamer customers then simply recycle the funds back to Skillz as game entrance fees and Skillz records it as revenue.  And this cycle repeats itself over and over again.

39.     After the merger, Defendant Sloan became a Director on Skillz's Board of Directors.

**B.      SKILLZ BUSINESS AND OPERATIONS**

40.     Skillz is an online mobile multiplayer competition platform that is integrated into a number of iOS and Android games.  Players use it to compete in competitions against other players across the world.  Skillz hosts esports tournaments and distributes prizes each month.  Gamers pay an entry fee to play in games or tournaments.  From there, the developer takes a percentage cut, Skillz takes a percentage cut, and winners get paid prizes as well.  Skillz was originally founded in 2012 by Paradise and Chafkin in Boston.  However, the Company has since moved its current headquarters to San Francisco, California.

41. At the time of the merger with FEAC, Skillz touted 40 million registered users and more than 30,000 registered developers on its gaming platform. "We were planning on being ready to go public at the end of Q4 [2020], but the SPAC route allows us to go to market a little bit faster…" Skillz founder and CEO Andrew Paradise said on CNBC's "Squash on the Street." (https://www.cnbc.com/2020/09/02/mobile-gaming-firm-skillz-is-the-next-deal-from-spac-behind-draftkings.html).

42. Following its merger with FEAC, Skillz went public and filed its first SEC Form 8-K on December 17, 2020. Contained in that 8-K was a Press Release, dated December 16, 2020, announcing that Skillz would begin trading on the New York Stock Exchange on December 17, 2020 under the ticker symbol "SKLZ". The press release further stated, "With just a fraction of the world's 2.7 billion gamers on its platform today, Skillz has a long runway for growth in building its service for 10 million game developers globally. Skillz is uniquely positioned to capitalize on the rapidly expanding mobile gaming market, which is expected to more than double by 2025 to $150 billion."

C. **DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD**

43. FEAC issued a press release that was filed on SEC Form 8-K on September 2, 2020. The press release stated, among other things:

> "**Today we're a leader in casual esports and are well positioned to capture the global esports opportunity which will increasingly define the gaming market**," said Andrew Paradise, CEO and Founder of Skillz. "Skillz fulfills the human desire for community and competition and is shaping the future of interactive entertainment."
>
> "I've been active in the evolution of gaming for 20 years, from ZeniMax to DraftKings, and **I believe Skillz has positioned itself as the platform for the future of gaming**, where entertainment, gaming, and enablement coverage," said Flying Eagle Chairman and CEO Harry E. Sloan.

(emphasis added).

44. FEAC issued a press release that was filed on SEC Form 8-K on September 3, 2020 with the attachment of the transcript of an investor call which was held on September 2, 2020:

Harry Sloan, CEO of Flying Eagle Acquisition Corp stated, "When I first met Andrew three years ago, we thought we were watching the creation of a mobile game company with some unique aspects of growth. We have since come to realize that what he has actually created is a platform unto its own. **Skillz is utterly unique and is positioned at the intersection of several of the most powerful trends in the digital world.** Gaming, video gaming, is now larger than movies, music, and books. It's driven by the proliferation of mobile devices and high-speed bandwidth worldwide. Mobile gaming in particular is the fastest-growing segment of the gaming market, and according to third-party industry data, the segment is expected to grow from $68 billion last year to $150 billion in 2025."

\*       \*       \*

Andrew Paradise, CEO and founder of Skillz stated, "We're proud of the business we have built over the last seven years. **We've focused on systematic skill and profitable growth, and we've been able to double or triple the business every year.** But honestly, we're much closer to the beginning than the end. We really view going public is a milestone, but not the end of the race for our Company. Just to give you one example, less than 10% of our revenue comes from outside North America today even though the International Mobile Gaming Market is four times larger outside of North America."

Paradise went on to say, "All of this is simply built so the developer can make a living doing what they love, and **that love is translated into an incredible ecosystem.** Our number one title's rotated many times over the last seven years, but gamers live in our platform; they move game to game. If you ask me how long have I been playing video games, it's 30 plus years. Our paying users today have 10 Skillz games installed. In 2015 this number was 3 games installed. Even though the top title continues to rotate over time, they're not shrinking or disappearing. In fact, they continue to grow, often quiet substantially, after being displaced from the number one position."

To give you an idea of this, our 2015 number one title has grown 30% of revenue since 2015. Our 2016 number one title has grown 268% in revenue since 2016. Our 2017 number one title has grown 110%, and I can keep going on and on. Over the past 12 months, the number of games that are generating over 1 million in GMB in the ecosystem has more than doubled. In fact, if you look at the other side of the ecosystem at attrition, we've only ever had three developers or $19,000 of GMB ever leave the system. That's less than half of a basis point of the $1.6 billion in GMB we expect to generate this year.

"**One of our seven values of our Company is frugality. Frugality means we are all about the efficient and thoughtful use of capital.** We treat every dollar of capital as if it's our own. It's the number one reason why we grant stock options to our employees. We want them to be owners. It's so ingrained in our operating ethos that with only $104 million of capital deployed, we've built a business that will generate $225 million of revenue this year and $555 million of revenue by 2022. And that doesn't require any new games or geographies. Today we're fully funded with well over $100 million of cash and undrawn debt, but the opportunity for smart deployment of capital is perhaps

11

stronger now than ever for Skillz."

(emphasis added).

45.     On September 8, 2020 FEAC filed its Merger Proxy Statement with the SEC, which was signed by Defendants Sloan and Baker.  Thereafter, on October 14, 2020, November 2, 2020, November 17, 2020, November 30, 2020, respectively, FEAC filed revised versions of the prospectus for the merger on forms S-4/A (collectively, with prior versions, the "Merger Proxy Statement").  The Merger Proxy Statement stated the following as "FEAC's Board of Directors' Reasons for the Approval of the Business Combination":

> On September 1, 2020, our board of directors unanimously (i) approved the signing of the Merger Agreement and the transactions contemplated thereby and (ii) directed that the BCA, related transaction documentation and other proposals necessary to consummate the Business Combination be submitted to our stockholders for approval and adoption, and recommended that our stockholders approve and adopt the BCA, related transaction documentation and such other proposals. Before reaching its decision, our board of directors reviewed the results of management's due diligence, which included:
>
> • research on the growth of mobile gaming generally in the United States and around the world, competitive platforms to Skillz and dynamics with other essential industry players for mobile game distribution;
>
> • extensive meetings (virtually and in person) and calls with Skillz's management team and representatives regarding operations, company services, major customers, financial prospects, the pipeline of potential new games and applications and possible acquisitions, among other customary due diligence matters;
>
> • review of Skillz's material business contracts and certain other legal and commercial diligence;
>
> • regulatory review of Skillz's model on a state-by-state basis and review of certain international regions;
>
> • financial and accounting diligence; and
>
> • creation of an independent financial model in conjunction with management of Skillz, which was generally consistent with the financial model prepared by each respective company.

46.     Notably, the Merger Proxy Statement made clear that the FEAC did not seek to obtain a formal appraisal of Skillz.  Skillz had a valuation of $3.5 billion based on revenue projections in excess

12

of $550 million for 2022.  These projections were based on unrealistic growth projections:

> **Our board of directors considered a wide variety of factors in connection with its evaluation of the Business Combination. In light of the complexity of those factors, the FEAC board of directors did not consider it practicable to, nor did it attempt to, quantify or otherwise assign relative weights to the specific factors it took into account in reaching its decision**. Different individual members of our board of directors may have given different weight to different factors in their evaluation of the Business Combination.

(emphasis added).

47.    According to the Merger Proxy Statement, FEAC's Board of Directors chose Skillz because it met all of the criteria it outlined:

> **In considering the Business Combination, FEAC's board of directors concluded that [Skillz] met all the above criteria.** In particular, the board considered the following positive factors, although not weighted or in any order of significance:
>
> > ***High-Growth Industry***. The global games market is substantial and growing rapidly. According to Newzoo, the interactive entertainment market grew from $84 billion in 2014 to $149 billion in 2019, and is larger than each of the markets of film box office, music and books. While the global games market as a whole has grown rapidly, the mobile gaming market has outpaced the broader industry's growth. According to Newzoo, mobile games was a $68 billion market in 2019 and the largest and fastest-growing segment of the global games market, growing at a 20% CAGR from 2014 to 2019. The proliferation of smartphones has been a key driver of this growth. According to Statista, in 2019 over 40% of the world's population currently owns a smartphone and that number continues to grow, creating an increasingly large market for game developers to target. According to Statista, in 2019, a quarter of all time on mobile devices was spent in games.
> >
> > ***Extraordinary User Engagement***. Skillz has developed a platform for game developers and end-users that has proven engaging and "sticky." Additionally, as its platform features more content, end-users have played more games. In the year ended December 31, 2019, Skillz estimates the average paying user spent an average of 62 minutes per day of game play on Skillz, exceeding the engagement levels of some of the most successful and well known on-line and mobile platforms in social media, games and general entertainment. Skillz tracks the number of games that end users play but does not monitor end user playing time on its platform, and this estimate is based on the time allowed to complete a tournament in the top three games for paying users featured on our platform. Accordingly, the actual time paying users spend per day on the platform may be less than such estimate. This has resulted in an average three-year

13

Lifetime Value to User Acquisition Cost of 4.5x (and after taking into account the end-user incentives recorded in sales and marketing expense is expected to be 3.0x).

***Significant Revenue and Earnings Growth Potential***. **Skillz's platform has enabled it to achieve an attractive financial profile, characterized by strong existing growth and continued prospects of accelerated growth**. From 2017 to 2019, Skillz achieved a revenue CAGR of over 167%. FEAC believes that Skillz is well positioned to continue its dynamic growth trajectory as it expands its distributions, expands its product offering and grows its platform internationally.

***Compelling Unit Economics***. Skillz is a high growth consumer internet business that yields favorable unit economics with an estimated four-month end-user payback period in 2020. In 2020, Skillz expects to achieve $225 million of revenue, with an estimated gross margin of 95%. As the company grows to scale, Skillz expects that normalized end-user acquisition costs, marketing expenses and relative size of its cost of operations will result in EBITDA margins over 30% from revenue. This makes Skillz an attractive investment, particularly relative to its peer companies.

***Experienced and Motivated Management Team***. **Skillz is a founder-driven business led by its CEO, Paradise**, and his co-founder, Casey Chafkin. Mr. Paradise's vision for the company and the competitive gaming industry at large is unique and difficult to duplicate given Skillz's proprietary technology and unique positioning. Mr. Paradise has further surrounded himself with top management talent, most recently, Scott Henry, who was hired as Skillz's Chief Financial Officer in August 2020.

(emphasis added).

48.     The Merger Proxy Statement also included statements concerning its potential partnerships with brands as follows:

***Increased Brand and Influencer Partnerships***

**We see a significant opportunity to build partnerships with brands to sponsor tournaments on our platform.** Brand advertisers are seeking new ways to engage with existing and potential customers online and are increasingly looking to us for sponsorship opportunities. In 2019, the majority of GMV on our platform was paid out in prizes and we believe brand advertisers sponsoring prizes represents a material business opportunity for us to both broaden our reach and increase profitability.

(emphasis added).

49.     The Merger Proxy Statement also stated the following, in pertinent part, regarding Skillz

14

and FEAC's due diligence:

> **Q:** *Why is FEAC proposing the Business Combination?*
>
> A: FEAC was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or other similar business combination with one or more operating businesses. **Based on its due diligence investigations of Skillz and the industries in which it operates, including the financial and other information provided by Skillz in the course of FEAC's due diligence investigations, the FEAC board of directors believes that the Business Combination with Skillz is in the best interests of FEAC and its stockholders and presents an opportunity to increase stockholder value.** However, there can be no assurances of this.

(emphasis added).

50.     The Registration Statement touted Defendant Paradise's experience and alluded to difficulty in replicating him:

> ***Experienced and Motivated Management Team***. Skillz is a founder-driven business led by its CEO, Paradise, and his co-founder, Casey Chafkin. **Mr. Paradise's vision for the company and the competitive gaming industry at large is unique and difficult to duplicate given Skillz's proprietary technology and unique positioning.** Mr. Paradise has further surrounded himself with top management talent, most recently, Scott Henry, who was hired as Skillz's Chief Financial Officer in August 2020.

(emphasis added).

51.     The Merger Proxy Statement also included certain Risk Factors with respect to Skillz's reliance on third-party platforms:

> In addition, **we rely upon third-party platforms, such as the Apple App Store**, **for distribution of the games featured on our platform.** The promotion, distribution and operation of apps are subject to the respective distribution platforms' standard terms and policies for application developers, which are very broad and subject to frequent changes and interpretation. Furthermore, the distribution platforms may not enforce their standard terms and policies for application developers consistently and uniformly across all applications and with all publishers.

52.     With respect to the standardization of game development and distribution, the Merger Proxy Statement stated:

> In 2019, there were over 10 million game developers making content. Moreover, distribution platforms such as Apple App Store, the Samsung Galaxy Store and **the Google Play Store have become ubiquitous, enabling developers to reach a broader audience and fueling a surge in content.**

15

(emphasis added).

53. On December 1, 2020, FEAC filed its required final amended prospectus on SEC Form 424(b)(3) which was signed by Defendants Sloan and Paradise. This final amended prospectus contained the same misrepresentations and omissions that were contained in the Merger Proxy Statement.

54. On December 16, 2020 Skillz issued a press release, which was attached to Skillz's SEC Form 8-K filed on December 17, 2020, entitled "SKILLZ BECOMES FIRST PUBLICLY-TRADED MOBILE ESPORTS PLATFORM" which quoted Defendant Paradise, CEO and founder of Skillz stating the following, in relevant part, regarding the Company's capabilities:

> Andrew Paradise, Founder and CEO of Skillz stated: "We built Skillz on the founding belief that esports are for everyone, and *have made significant progress toward our vision of enabling everyone to share in future of competition…*We stand at the intersection of mobile gaming and esports, perhaps the two most exciting growth opportunities of the next decade. I thank the entire Skillz team for their dedication, passion, and creativity, which have led us to this incredible moment on our journey to build the competition layer on the internet."

> I've had a front row seat to the video game and entertainment industry's evolution over the past two decades, from my role as founding investor and board member of Bethesda Games to recently taking DraftKings public," said Harry Sloan, Chairman of Flying Eagle. "*We believe that Andrew has positioned Skillz to lead the convergence of mobile, gaming, and player enablement into the future of entertainment itself.*

(emphasis added).

55. Skillz continued to tout its unrealistic business prospects in the first quarter of 2021 and failed to inform investors of the negative information it had in its possession about its business, in particular the rapidly declining downloads and installs of its three most revenue producing games that accounted for 88% of Skillz's revenue. Skillz failed to disclose this and other information because it was set to initiate another public offering.

56. On February 8, 2021, Skillz announced it was issuing 32,000,000 shares of its Class A common stock through an underwritten public offering (the "Secondary Offering"). This Secondary

Offering consisted of 17,000,000 shares being offered by Skillz and 15,000,000 shares being offered by certain selling insider stockholders.  In connection with this Secondary Offering, Skillz filed with the SEC a Form S-1 Registration Statement (the "Secondary Offering Prospectus.").

57.    Skillz's Secondary Offering Prospectus contained the following statements about various aspects of its financial condition and its industry and market:

- "Our revenue increased 201% in 2018 to $51 million, and our net loss increased 147% to $28 million. Our revenue increased 136% in 2019 to $120 million, and our net loss decreased 15% to $24 million. For the nine months ended September 30, 2020, our revenue increased 91% to $162 million, and our net loss increased 426% to $79 million."

- "Mobile Gaming is Rapidly Growing: The mobile gaming market grew at a 20% CAGR from 2014 to 2019 and is expected to grow from $68 billion in 2019 to $150 billion in 2025."

- "Grow the Core: We reach fewer than 2% percent of mobile gamers in North America markets and are investing in marketing to expand our audience."

- "Increase Brand and Influencer Partnerships: More than 80% of our GMV is paid out in prizes today. We believe brand advertisers sponsoring those prizes have the potential to broaden our reach and drive increased profitability for our business."

58.    The Secondary Offering Prospectus touted the growth industry and numerous opportunities that Skillz had to attract new customers.  For example:

### Mobile Gaming is Rapidly Growing

The global games market is substantial and growing rapidly. According to Newzoo, the interactive entertainment market grew from $84 billion in 2014 to $149 billion in 2019, and is larger than each of the markets of film box office, music and books. While the global games market as a whole has grown rapidly, the mobile gaming market has outpaced the broader industry's growth. According to Newzoo, mobile games was a $68 billion market in 2019 and the largest and fastest-growing segment of the global games market, growing at a 20% CAGR from 2014 to 2019. **The proliferation of smartphones has been a key driver of this growth.** According to Statista, in 2019 over 40% of the world's population currently owns a smartphone and that number continues to grow, creating an increasingly large market for game developers to target. According to Statista, in 2019, a quarter of all time on mobile devices was spent in games.

### Democratization of Content Creation

The introduction of standardized game development and distribution platforms has democratized content creation, leading to a significant increase in content. Traditionally,

game development required large studios and customized software development, creating high barriers to entry. Today's mobile game development tools such as Unity and Unreal are intuitive and low-cost, transforming the game development process into a "click-to-create" process enabling anyone to build game content. In 2019, there were over 10 million game developers making content. **Moreover, distribution platforms such as Apple App Store, the Samsung Galaxy Store and the Google Play Store have become ubiquitous, enabling developers to reach a broader audience and fueling a surge in content.**

***Our Growth Strategy***

According to Newzoo, there are currently 2.7 billion mobile gamers worldwide. We currently serve only 2.7 million MAUs as of September 30, 2020, a small fraction of the addressable market. We believe we are just in the early phases of addressing our significant market opportunity.

59.    Lastly, the Secondary Offering Prospectus discussed "Key Components" of Skillz's revenue model.   In particular, Skillz stated:

**Key Components of Results of Operations Revenue**

Skillz provides a service to the game developers aimed at improving the monetization of their game content. The monetization service provided by Skillz allows developers to offer multi-player competition to their end-users which increases end-user retention and engagement.

**By utilizing the Skillz monetization services, game developers can enhance the player experience by enabling them to compete in head-to-head matches, live tournaments, leagues, and charity tournaments and increase player retention through referral bonus programs, loyalty perks, on-system achievements and rewarding them with prizes (including Bonus Cash prizes)….**

(emphasis added).

60.    Pursuant to the Secondary Offering, Skillz reportedly raised $408 million.

**D.    THE TRUTH IS GRADUALLY REVEALED**

61.    On March 8, 2021, a research report by Wolfpack Research titled "SKLZ: It Takes Little Skill to see this SPACtacular Disaster Coming" (the "Wolfpack Report") was publicly released which described, among other things, how: (i) third-party app data shows installations of the three games responsible for 88% of Skillz's revenues (21 Blitz, Solitaire Cube, and Blackout Bingo) all declined substantially; (ii) Skillz did not disclose the substantial decrease in the popularity of these three games

(despite their material importance to its growth trajectory); (iii) Skillz is not taken seriously by gaming industry players; (iv) Skillz has a long history of boasting about "big partnerships" which have amounted to nothing of value; and (v) CEO Paradise does not have the relevant experience that has been expressed.

62.     The Wolfpack Report alleged that installations for three games which make up 88% of Skillz revenue all declined substantially, stating, in pertinent part:

> We found that the three games responsible for 88% of SKILZ's revenues in the first 9 months of 2020 had all peaked by Q3 2020. **Downloads for SKLZ's full lineup of games began to show overall declines in Q1 2021, while the company has projected 61.4% YoY growth in 1Q21**.
>
> \*          \*          \*
>
> SKLZ's 63% revenue growth in 2021 is entirely unachievable without it stumbling upon multiple new hits. Relying on unpredictable and rare successes from a highly concentrated customer base is not a sustainable (or investible) business, in our review. **We foresee a lot of pain for SKLZ in 2021 as it attempts to live up to the unrealistic projects it has provided for 2021-2022**.

(emphasis added).

63.     The Wolfpack Report alleged that Skillz did not disclose the declining downloads with the three games on which it relies upon for 88% of its revenues, even though those games were declining in revenue, in an effort to conceal the true projections, stating, in pertinent part:

> Third Party app data shows that installs of 21 **Blitz, Solitaire Cube, and Blackout Bingo al declined -52%, -40%, and -20%, respectively, in Q4 2020**. As of March 3, 2021, those games were on track to continue their declines in Q1 2021.
>
> Based on a careful reading of SKLZ's prospectuses, we estimate that revenue from Solitaire Cube and 21 Blitz, the top two games from Tether studios, **shrank -5.9% in Q3 2020. We believe Skillz did not disclose these issues because they render the company's lofty revenue projections farcical.**
>
> \*          \*          \*
>
> **Considering the weakness that we are already seeing in Skillz's top developer's games, we believe the company's projections of +146% two-year revenue growth is simply unattainable**. This is why Skillz's former shareholders took as much cash off the table as soon as possible in the SPAC deal.

19

(emphasis added).

64.    The Wolfpack Report alleged that former employees and industry experts believe Skillz

is not taken seriously by gaming industry players, stating, in pertinent part:

> Our conversations with former employees suggested that large studios are unwilling to touch Skillz's platform, both because the Skillz platform is not robust enough to adequately handle their needs with synchronous play and international matchmaking. One former Skillz employee we spoke to made the following statement regarding Skillz's reputation in the gaming industry:
>
> **"In the gaming industry, Skillz does not have good brand recognition. Most of the players in the industry consider them a joke."**
>
> Skillz was thrown off of the Google Play store in 2013, along with all real-money gaming apps. Recently, Google reversed this long-standing prohibition for licensed gambling apps like DraftKings but **excluded Skillz** and other real-money gaming apps from the policy change. As you can see from the examples of violations, <u>it's almost as if the third bullet point was written specifically for Skillz</u>:

### Effective March 1, 2021

We allow real-money gambling apps, ads related to real-money gambling, and daily fantasy sports apps that meet certain requirements.

> In our view, this explicit exclusion by Google suggests Skillz has no way in its current business model to get back onto the most popular Android store.
>
> *          *          *
>
> Despite being snubbed repeatedly, Skillz CEO Andrew Paradise continues to tout Android phones as a low-hanging $7 billion TAM expansion. **We believe this is at best an exaggeration and at worst, a fiction. Android Skillz users have to know to use Samsung's Galaxy App Store or to install the games via a multi-step, manual process. Furthermore, Google is reportedly pushing for the elimination of the Galaxy App Store altogether, a further risk to Skillz.**
>
> We expect CEO Andrew Paradise to keep trying to sell his Google Play dream, but considering the verbiage in the "Examples of violations" shown above, a dream is all that will ever be for SKLZ (as well as a likely nightmare for investors). We are also looking forward to hearing him attempt to explain away our report and defend SKLZ's ridiculous Q1 and full year 2021 guidance. We'll see how well Mr. Paradise keeps his composure when pressed- we've heard he doesn't react well to criticism.

(emphasis added).

65.    The Wolfpack Report also alleges that Skillz has a habit of boasting about "big

partnerships" which have amounted to nothing of value, stating in pertinent part:

We believe Skillz's Superbowl week announcement of a "global game developer challenge" to develop an NFL-themed mobile game on its platform was little more than an opportunistic stock pump:



This press release was published the morning of February 4, 2021. SKLZ's stock closed at its all time high, up nearly 25% that day. The stock peaked at $43.72 the following day, Friday, February 5.

Coincidentally, SKLZ filed an S-1 registering 38,616,576 Shares of Class A Common Stock and 5,016,666 Warrants for selling shareholders the following Monday, February 8, enabling many early investors to sell millions of shares of SKLZ stock at this inflated price.(https://www.sec.gov/Archives/edgar/data/1801661/000110465921016167/tm2118 44-1_s1.htm)

*       *       *

We made a developer profile on Skillz platform and found no evidence of an NFL deal or contest being held in the developer portal. If this was a big multi-year deal, why wouldn't there be any documentation or details in the developer portal?

A site search of nfl.com does not even register the term "Skillz" unless we count the people talking in slang. We were unable to find a reference from the NFL side at all aside from Skillz press release itself.

21

\*        \*        \*

**Other Skillz announced partnerships that never came to fruition include:**

- **2013:** Skillz announced a partnership with Glu Mobile, which never actually materialized.        (https://www.reuters.com/article/us-mobilegaming-glu-idINBRE94T0EB20130530)

- **2014: *"Buck Hunter" (part one)* –** SKLZ announced a deal with Buck Hunter back in 2014 and the CEO, Andrew Paradise, made it sound like it would be huge, but nothing ever came of the deal:

- "We are excited to partner with such a well-known and storied brand," said Skillz CEO Andrew Paradise. Now, everyone around the world can compete for cash and glory with the Big Buck Hunter mobile app powered by Skillz." (https://www.pocketgamer.biz/news/60183/skillz-brings-cash-prizes-to-big-buck-hunter/)

- **2017:**        Skillz        reported        partnership        with        Beeline        Interactive (https://www.skillz.com/beeline-partners-with-skillz-to-launch-street-fighter-on-leading-mobile-competition-platform/), a division of Capcom, who owns the **Street Fighter franchise**. There was a problem, though. ***Skillz platform can't host live 1v1 games***. Nothing ever came of this "*big partnership*" either. (https://comicbook.com/gaming/news/new-street-fighter-coming-to-mobile-from-capcom-and-skillz/)

- **January 2021: *"Buck Hunter" (part two)*** – Skillz announced another purported partnership with Buck Hunter in a January 28, 2021 press release (https://www.businesswire.com/news/home/20210128005171/en/Play-Mechanix-Partners-with-Skillz-to-Bring-Mobile-Competition-to-Legendary-First-Person-Shooter-Big-Buck-Hunter), wherein Mr. Paradise referred to Buck Hunter as *"a cultural icon for 20 years"* but never mentions the 2014 purported partnership.

- **February 2021: NFL** – we aren't holding our breath. At best, the competition begins mid- 2021 and won't be complete for another year after that. We doubt anything of substance comes from this deal.

66.    The Wolfpack Report also alleges that CEO Paradise does not have the relevant experience he claims, stating, in pertinent part:

> While we have to give him credit for selling AisleBuyer to Intuit for $20 million in 2012, (INTU Acquisitions via Bloomberg LP) the only other business we could find Mr. Paradise claim to have sold was "Photrade." However, we wouldn't consider his sale of Photrade to MPA, Inc. (who went bankrupt 2 years later) for $3,829 in warrants, or the price of a used treadmill sitting in a basement, enough to qualify him as a "serial entrepreneur."

67.     On the day of the Wolfpack Report was released, shares of Skillz plummeted by 10.9% to close at $24.45.  This disclosure represented approximately $762 million loss of investor value.

68.     On March 12, 2021, Skillz filed its yearly report on Form 10-K with the SEC for the fiscal year ending December 31, 2020 (the "2020 Annual Report").  The annual report was signed by Defendants Paradise, Henry and Sloan. Attached to the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Paradise and Henry attesting to the accuracy of the financial statements and disclosures.

69.     The 2020 Annual Report stated in Item 1 "Our Platform Overview" was as follows:

> Our proprietary platform revolutionizes and democratizes the mobile gaming industry and allows us to deliver gaming experiences that our player community trusts and loves and "levels the playing field" for every developer. **We believe we are re-inventing competitive mobile gaming and thereby expanding the mobile gaming market.** Our technology platform aligns the interests of developers and gamers with respect to user monetization, instead of putting them at odds. Traditional mobile games utilize in-game advertisements or purchase, which create friction in the user experience, hurting engagement and retention. By monetizing user engagement primarily through prizes, we create a compelling alternative for both developers and users for any competitive game. With our system, the more users enjoy playing in contests for prizes and the longer they play, the more revenue we generate for developers. **This dynamic generates significantly stronger monetization for developers.**

(emphasis added).

70.     The 2020 Annual Report also stated the following regarding "Our Marketing":

> **Our ability to effectively market to potential users is important to our operational success. With a blend of our analytics and data science, we leverage software tools to efficiently acquire, retain and engage users while reinforcing our trusted consumer-facing brand for both the end users and our developer partners.** We acquire and engage users primarily through digital ad networks, our game developers and affiliate partners. We use paid marketing channels, in combination with compelling offers and exciting games, to achieve our objectives. **We optimize our marketing investment across all our channels in order to generate strong returns on our marketing spending.** We currently expect that the average Three-Year Lifetime Value of our 2018, 2019 and 2020 cohorts will be 3.8x our total user acquisition cost (and after taking into account the end-user incentives recorded and expected to be recorded in sales and marketing expense is expected to be 2.5x). **Three-Year Lifetime Value means cumulative gross profit from a paying user over thirty-six (36) months following user acquisition, which is based on a combination of historic data and extrapolation of historic data for future periods.** User acquisition costs include expenses incurred in

the period to acquire the cohort of users, including digital advertising costs, affiliate marketing costs, third-party vendors and software tools used by the user acquisition marketing team.

*See* Skillz 10-K filed on March 12, 2021 (emphasis added).

71.     The representations in the 2020 Annual Report were false and misleading in failing to disclose the material facts set forth herein.

72.     On March 15, 2021, an anonymous Twitter user @Restrinct published a report (the "Restrinct Report") highlighting a myriad of problems with Skillz, specifically, Skillz's massive sales and marketing expenditures which are "essentially paying a dollar in advertising to show eighty cents in growth".  The Restrinct Report stated the following and provided a link to Skillz's 10-K:

> We foresee S&M spend continuing to scale side-by-side with revenue growth in 2021 (just as it has in 2020 and 2019) in order for management to reach their forecasted growth targets, however as the data shows it will be unsustainable as the company continues to spend a dollar in marketing to show eighty cents in temporary revenue.
>
> **2019 Compared to 2018**
>
> Sales and marketing expenses increased by $59.7 million, or 115%, to $111.4 million in 2019 from $51.7 million in 2018. The increase was attributable primarily to a 113% increase in spend to acquire new paying users and 145% increase in engagement marketing spend. User acquisition marketing costs were $52.5 million and $24.2 million in 2019 and 2018, respectively. Engagement marketing costs were $50.7 million and $20.7 million in 2019 and 2018, respectively. Engagement marketing as a percentage of revenue increased to 42% in 2019 from 41% in 2018.

73.     On March 12, 2021, Skillz held an earnings conference call regarding its Fourth Quarter 2020 and year-end results.  During the conference call, CEO Paradise failed to specifically address a direct question from an analyst concerning the issues raised by Wolfpack regarding the decline in "download activity" and "how it might be slowing down a little bit in some of those key games."  CEO Paradise deflected the question and did not address its core premise: the substantial decrease in download activity of three key games.  Paradise's deliberate non-response to the analysts continued to mislead investors regarding the Company's growth prospects.

74.     Moreover, despite having promised the market that they would not sell their Class B

shares for at least 24 months after taking Skillz public, the Individual Defendants all sold substantial portions of their Skillz holdings on March 23, 2021, reaping over $240 million in personal profit. For example, defendant Paradise sold 8,402,866 shares at $23.24 reaping proceeds of $196.1 million. As insiders, the Individual Defendants knew that the Company had disseminated false or misleading information about the Company's long-term growth.

75.     The Secondary Offering Prospectus was false and misleading in failing to disclose the material facts set forth herein.

76.     On April 19, 2021, an anonymous Twitter account named Eagle Eye Research, released a short seller report. The report states, "The company has never turned a profit and we doubt it ever will". The Eagle Eye Report alleges that Skillz is "recognizing revenue from 'virtual' money it gave its customers to spend although no real cash is generated in the process". The Eagle Eye Report places emphasis on the fact that sales and marking includes "limited-time Bonus Cash".

> More importantly, when we dug into the composition of S&M expense for SKLZ, we discovered a material expense for "end-user incentives". The company defines these as promotions that are "offered to end-users to draw, re-engage, or generally increase end-users' use of the Company's platform." These consist of "limited-time Bonus Cash" offers as well as league prizes in the form of cash or luxury goods (p.63 of 10-K). *Limited-time* Bonus Cash is issued to existing players to stimulate engagement and is distinct from *initial deposit* Bonus Cash issued to new players (recorded as a reduction of revenue). We believe limited-time Bonus Cash offers and cash prizes represent the

> The Company provides Monetization Services to game developers enabling them to offer competitive games to their end-users. These activities are not distinct from each other as the Company provides an integrated service enabling the game developers to provide the competitive game service to the end-users, and as a result, they do not represent separate performance obligations. The Company is entitled to a revenue share based on total entry fees for paid Competitions, regardless of how they are paid, net of end-user prizes (i.e., winnings from the Competitions) and other costs to provide the Monetization services. The game developers' revenue share, however, is calculated solely based upon entry fees paid by net cash deposits received from end-users. End-user incentives are not paid for by game developers. In addition, the Company reduces revenue for end-user incentives which are treated as a reduction of revenue.

> vast majority of end-user incentives within Sales and Marketing. This is problematic: **Bonus Cash and cash prizes incurred as an expense will be quickly recycled into revenues in the form of entry fees.** The users have no other use for Bonus Cash than to redeploy into games, and winners of cash prizes tend to be highly active players who need to fund regular and continuous play to maintain their winning activity. When the incentives are recycled, SKLZ gets to recognize revenues based on their cut of entry fees

regardless of how they are paid, whether through real cash or Bonus Cash. This is described in the company's S-1:

Page F-37 of S-1 filed on February 8, 2021: SKLZ gets to recognize revenues based on their cut of entry fees regardless of how they are paid, be it through real cash or Bonus Cash.

(emphasis added).

77.     The Eagle Eye Report alleges that Skillz is effectively giving its customers money to spend on Skillz and is recognizing revenue from it.  The Eagle Eye Report calculated cash revenue, citing Skillz's revenue recognition policy mispresents the financial condition of the business and that true cash revenue is less than one-half of what management portrays to investors.

78.     Short seller reports, Restrint and Eagle Eye Research, claim that end user incentives account for a large portion of Skillz's revenue.  In 2020, Skillz reported total revenue of $230.1 million and totaled $91.5 million in sales and marketing expenses related to end user incentives.  These end user incentives account for 40% of Skillz's revenue in 2020. This trend seems to not only continue but is getting worse.  In the most recent Q1 earnings for 2021, Skillz reported total revenue of $83.7 million of which, $54.3 million was attributed to sales and marketing expenses related to end-user incentives. End user incentives accounted for 64.8% in Q1 2021.  The end user incentives in Q1 2021 saw a 2.9% increase from Q1 2020 in which sales and marketing expenses related to end user incentives made up 61.9% of Skillz's revenue.

79.     As a result of the information published in the Eagle Eye Report, shares of Skillz plummeted by 6.61% to close at $14.11 on April 19, 2021.

80.     On May 5, 2021, Skillz filed a press release with the SEC on Form 8-K announcing its results for the first quarter of 2021, which stated, *inter alia*, that Skillz's revenues "grew to 83.7 million," but that it recorded a net loss of $53.6 million. It also stated that GMV (Gross Marketplace Volume), *i.e.*, the total dollar amount of game entry fees paid by users, increased to $566.6 million. This press release also showed its Sales & Marketing expenses, where Skillz records the Bonus Cash

incentives it provides to its gamers to enter its games, more than doubled as compared to the same period in 2020.

81.     On this news, Skillz stock substantially declined by 8.72% to close at $15.48, and continued to drop the next day, closing at $15.41.

82.     As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ALLEGATIONS

83.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who purchased publicly traded Skillz securities on the NASDAQ during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of Skillz and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

84.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Skillz securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

85.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

86.     Plaintiff will fairly and adequately protect the interests of the members of the Class and

has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interest antagonistic to or in conflict with those of the Class.

87.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

•       whether the Exchange Act was violated by Defendants' acts as alleged herein;

•       whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

•       whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

•       whether the Defendants caused the Company to issue false and misleading filings during the Class Period;

•       whether Defendants acted knowingly or recklessly in issuing false filings;

•       whether the prices of Skillz securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

•       whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

88.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE FRAUD ON THE MARKET DOCTRINE

89.     The market for Skillz shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statement and/or failures to disclose, Skillz's shares traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Skillz shares and market information relating to Skillz and have been damaged thereby.

90.     During the Class Period, the artificial inflation of Skillz's shares was caused by material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Skillz's business, prospects, and operations.   These material misstatements and/or omissions created an unrealistically positive assessment of Skillz's financials and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Skillz shares at such artificially inflated prices, and each of them has been damaged as a result.

91.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

•       Skillz shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

•       As a public issuer, the Company filed periodic public reports;

•       Skillz regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major

newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

   • Skillz's securities were liquid and traded with moderate to heavy volume during the Class Period; and

   • The Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

92.   Based on the foregoing, the market for Skillz securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

93.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated UTE Citizens of the State of Utah v. United States,* 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## LOSS CAUSATION

94.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

95.   During the Class Period, Plaintiffs and the Class purchased Skillz's shares at artificially inflated prices and were damaged thereby.  The price of Skillz shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## NO SAFE HARBOR

96.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the allegedly false statements and omissions pled in this Complaint.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

The statements alleged to be false and misleading herein all relate to then-existing facts and circumstances.  To the extent certain of the statements alleged to be false and misleading may be characterized as forward-looking, they were not adequately identified as "forward-looking" statements when made, and were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ material from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pled herein, Skillz and Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Due to Defendants' positions with Skillz, and access to Skillz's material information that was unavailable to the public, Defendants knew that the adverse facts described herein were not disclosed to and were being concealed from investors. Defendants are liable for the false statements and omissions alleged herein.

16
17

## SCIENTER ALLEGATIONS

18
19
20
21
22
23
24
25
26
27
28

97.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Skillz and Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Skillz, their control over, and/or receipt and/or modification of Skillz's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Skillz, participated in the fraudulent scheme alleged herein.

98.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company.

99.     The Individual Defendants, because of their positions with Skillz, made and/or controlled the contents of the Company's public statements during the Class Period.  Each Defendant was provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, these Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were materially false and misleading.  As a result, each of these Defendants is responsible for the accuracy of Skillz's corporate statements and are therefore responsible and liable for the representations contained therein.  The Individual Defendants were highly motivated to personally profit from misstatements that inflated the market prices of Skillz' shares.  For example, Defendant Sloan stood to reap substantial benefits and recovery expenses in connection with the Business Combination with Skillz approved on December 16, 2020.  Similarly, several Individual Defendants stood to profit from the sale of their shares at inflated prices pursuant to the Secondary Offering.  Less than one month later, the price of Skillz's shares had declined by nearly one-half or $11 per share.

100.    According to the Secondary Offering Prospectus, on March 23, 2021, the Individual Defendants sold millions of shares in the Secondary Offering.  Specifically, Defendant Paradise sold 8,402,866 shares at an average price of $23.34 per share for a total sale of $196.1 million.  Defendant Aguirre sold 274,825 shares at an average price of $23.34 per share for a total sale of $6.41 million.  Defendant Chafkin sold 1,673,599 shares at an average price of $23.34 per share for a sale of $39

million.  These Defendants had total sales of $240 million on March 23, 2021.  The following day, March 24, 2021, the stock price had decreased by 14.35% to $19.99.

<u>**COUNT I**</u>

**For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
Against All Defendants**

101.   Plaintiff repeats and realleges each and every allegation contained above as it fully set forth herein.

102.   This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

103.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

104.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- Employed devices, schemes and artifices to defraud;

- Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchased of Skillz securities during the Class Period.

105.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such

statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of Skillz's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

106. Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Skillz personnel to members of the investing public, including Plaintiff and the Class.

107. As a result of the foregoing, the market price of Skillz securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Skillz securities during the Class Period in purchasing Skillz securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

108. Had Plaintiff and the other members of the Class been aware that the market price of Skillz securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Skillz securities at the artificially inflated prices that they did, or at all.

109. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

110. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for

substantial damages which they suffered in connection with their purchase of Skillz's securities during the Class Period.

## COUNT II

**Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

111.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as it fully set forth herein.

112.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of Skillz's business affairs.   Because of their senior positions, they knew the adverse non-public information about the Company's false financial statements.

113.    As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Skillz's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

114.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Skillz disseminated in the marketplace during the Class Period concerning the Company's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein.   The individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Skillz securities.

115.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

(c)    awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED.

Plaintiff hereby demands a trial by jury.

Dated: June 17, 2021

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Telephone: 310-405-7190
jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
Thomas H. Przybylowski
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor

New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:   (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
tprzybylowski@pomlaw.com

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.  I,  Richard G Shultz _____, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section

21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private

Securities Litigation Reform Act of 1995.

2.  I have reviewed a Complaint against Skillz Inc. ("Skillz" or the "Company") and

authorize the filing of a comparable complaint on my behalf.

3.  I did not purchase or acquire Skillz securities at the direction of plaintiffs' counsel

or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.  I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Skillz securities during the class period, including providing

testimony at deposition and trial, if necessary. I understand that the Court has the authority to

select the most adequate lead plaintiff in this action.

5.  The attached sheet lists all of my transactions in Skillz securities during the Class

Period as specified in the Complaint.

6.  During the three-year period preceding the date on which this Certification is

signed, I have not served or sought to serve as a representative party on behalf of a class under the

federal securities laws.

7.  I agree not to accept any payment for serving as a representative party on behalf of

the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such

reasonable costs and expenses directly relating to the representation of the class as ordered or

approved by the Court.

8.  I declare under penalty of perjury that the foregoing is true and correct.

Executed    5/16/21
           (Date)

(Signature)

Richard G Shultz
(Type or Print Name)

**Skillz Inc. f/k/a Flying Eagle Acquisition Corp. (SKLZ)**                    **Shultz, Richard G**

**List of Purchases and Sales**

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 1/6/2021 | 73 | $23.8800 |
| Purchase | 1/6/2021 | 1,527 | $23.8710 |
| Purchase | 1/25/2021 | 500 | $29.8000 |
| Purchase | 3/3/2021 | 4,500 | $30.0000 |
| Purchase | 3/9/2021 | 1,630 | $25.9900 |
| Purchase | 3/9/2021 | 160 | $25.3781 |
| Purchase | 3/26/2021 | 500 | $19.0000 |
| Purchase | 3/26/2021 | 500 | $18.7500 |
| Purchase | 3/26/2021 | 500 | $18.5000 |
| Purchase | 3/26/2021 | 500 | $18.2500 |
| Purchase | 3/26/2021 | 500 | $17.7500 |
| Purchase | 3/29/2021 | 500 | $18.0000 |
| Purchase | 3/30/2021 | 500 | $17.0000 |
| Purchase | 4/1/2021 | 500 | $19.2500 |
| Purchase | 4/1/2021 | 500 | $19.0000 |
| Purchase | 4/1/2021 | 500 | $18.7500 |
| Purchase | 4/1/2021 | 500 | $18.5000 |
| Sale | 2/12/2021 | (3,100) | $38.2000 |
| Sale | 3/24/2021 | (6,290) | $21.7001 |
| Sale | 4/15/2021 | (5,500) | $15.5500 |